CAPE MAY COUNTY CIRCUIT COURT.

IN THE MATTER OF THE CONTEST OF THE ALLEGED ELECTION OF WILLIAM C. HUNT TO THE OFFICE OF STATE SENATOR FOR THE COUNTY OF CAPE MAY.

Decided April 7, 1937.

For the petitioners, *John A. Matthews, Charles Hirshenstein, Edward J. O'Mara, Aloysius McMahon, Charles A. Rooney* and *George R. Greis*.

For the incumbent, *Andrew O. Wiltreich, Andrew J. Cafiero, T. Millet Hand, William A. Stevens, Howard Mackay, Henry Young, Jr.,* and *Robert Carey.*

JAYNE, C. C. J. If the election laws of this state do not accomplish all that may be fairly expected from them, the fault should not repose in the indifference of the courts.

At the general election on November 3d, 1936, in the county of Cape May, William C. Hunt and Jesse D. Ludlam were candidates for the office of state senator. The subsequent examination of the statements of the several district boards of the county enabled the board of county canvassers to determine that eight thousand seven hundred and sixty-seven votes were cast and counted for Hunt and that eight thousand three hundred and thirty votes were received for Ludlam. This is the election to which this proceeding relates.

It is not inappropriate to preface this opinion with some concise description of the dimensions which the proceeding has ultimately assumed and to also chronologize some of the principal events in its prosecution.

On November 9th, 1936, the requisite bond having been approved by the justice of the Supreme Court (*Kuestner* v. *Boscarell,* 5 *N. J. Mis. R.* 303; 136 *Atl. Rep.* 506), a petition was filed with the clerk of this court by nineteen voters of the county to contest the election of William C. Hunt. *Pamph. L.* 1930, *article* XXVI, *ch.* 187, *p.* 829; *Supp. Comp. Stat.* 1925-1930, *p.* 605, § 65-2601A. Amendments of the petition were permitted to be filed on December 3d, 1936, and on December 5th, 1936, to particularize the allegations of the original petition. Article XXVI, paragraph 359, section 5. *Supp. Comp. Stat.* 1925-1930, *p.* 607, § 65-2605A.

The hearing of this contest was undertaken on December 7th, 1936, and was in progress until March 4th, 1937. The arguments of counsel were heard on March 23d, 1937. Two hundred and eighty-six witnesses have been interrogated. Canvass books, registry books, poll books, returns, certificates, affidavits and numerous other exhibits, two hundred and twenty-five in all, have been admitted in evidence. The tran-

script of the stenographic notes of this proceeding occupies eleven volumes. It is reasonable to assume that never again in many years will a proceeding, encompassing such widespread interests and political consequences, enter our courts, yet it has been possible to conduct this proceeding in an orderly, dispassionate and deliberate manner and in a patient, temperate and sincere effort to discover the facts. Counsel were forewarned that the decision would be erected upon the merits to be harvested from the law and the evidence and not upon the admixture of any other elements not required to form a conscientious and just determination.

It is time now to turn to the controversial issues of law.

The question of jurisdiction lies at the threshold of this proceeding and its solution should therefore be accorded primary consideration.

It is asserted in behalf of the incumbent that the Circuit Court lacks jurisdiction to hear a contest relating to the election of a member of the legislature. The fabric of the argument consists of the contentions that the constitution of our state has expressly conferred this power exclusively upon the legislative department and if so, that the legislature cannot constitutionally bestow any such authority upon the judicial department of the government.

Of course, it is to be at once acknowledged that our state constitution in the second paragraph of section 4, article IV, declares that "each house shall be the judge of the elections, returns and qualifications of its own members." A like provision relating to the organization of legislative bodies may be commonly discovered in constitutions. Indeed, our first constitution of New Jersey adopted July 2d, 1776, provided that the general assembly and the legislative council were respectively to be the judge of the "qualifications and election" of their own members. Similar provision relating to the determination of the qualifications and elections of members of the congress is found in article I, section 5, of the federal constitution. The exercise of the power thus expressly accorded was not a new-fashioned practice in legislative assemblages at the time of the adoption of our constitutions. The houses of the English parliament long reserved and employed such a power.

Our constitution of 1844 was submitted to the vote of the people. It derives its vitality from the public will and it is the fundamental law of the state until supplanted either by a new constitution or by amendment in the manner therein provided. The power to judge the elections, returns and qualifications of its own members reposes, under the constitution, in the senate itself. Let it be immediately understood that this court has no inordinate and covetous inclination to arrogate an unquestionable prerogative of the state senate.

But what is comprehended by the power to judge, thus conferred upon the senate? It is the exclusive power to *finally judicially determine* the election of a member of the senate. *Kearns* v. *Edwards*, 17 *N. J. L. J.* 51; 28 *Atl. Rep.* 724; *Ruh* v. *Frambach*, 47 *N. J. L.* 85; *Van Winkle* v. *Caffrey*, 12 *N. J. Mis. R.* 834; 175 *Atl. Rep.* 362.

Additionally counsel for the incumbent invite attention to the prohibitive clause embodied in article III of our constitution. It may be quoted: "And no person or persons belonging to, or constituting one of these departments, shall exercise any of the powers properly belonging to either of the others, except as herein expressly provided." At the moment, it need only be observed that the force of this clause is, not to confine the legislature to powers which are legislative, the governor to powers which are executive and the courts to powers which are judicial, but merely to forbid each department to encroach upon the powers properly belonging to another. *Ross* v. *Freeholders of Essex*, 69 *N. J. L.* 291, 294; 53 *Atl. Rep.* 1042.

In *Paul* v. *Gloucester County*, 50 *N. J. L.* 585, 610; 15 *Atl. Rep.* 272, Mr. Justice Van Syckel, speaking for the Court of Errors and Appeals, said:

"This constitutional clause relates only to those powers which, by the constitution itself, are assigned to, or which, in their nature, pertain to one of the three departments exclusively. * * * But there is a multitude of governmental duties which have never been and cannot possibly be performed, either by the legislature or by the governor, and which are certainly not prescribed by the constitution to the judiciary. * * * The conclusion is inevitable that this

multitude of duties was regarded as lying outside of what were termed the powers properly belonging to the executive, legislative and judicial departments, and was left by the constitution to be discharged in such mode as the law should provide."

It is apparent that, except for the divergencies previously mentioned, the argument of counsel for the incumbent and the views of this court are not, up to this point, discordant.

Moreover the insistence that the legislature cannot constitutionally convey to the judicial department the power to *finally judicially determine* the qualifications and elections of its own members is firmly tenable and beyond the domain of reasonable debate. *Kearns* v. *Edwards, supra; Van Winkle* v. *Caffrey, supra.*

It transpires that the contention of counsel for the incumbent is constructed upon a fundamental fact which has been erroneously assumed. It is essential to completely comprehend the power or so-called jurisdiction which this court is in fact exercising. Assuredly the court has no common law jurisdiction over the subject-matter of this contest. The proceeding is purely a statutory device designed to effectuate a purpose readily perceivable.

The power which this court assumes to exercise, or more accurately stated, the duty which this court is undertaking to discharge, springs from the statute. *Pamph. L.* 1930, *art.* XXVI, *p.* 829, (*supra*). This enactment provides that "the nomination or election *of any person to any public office* or party position, or the approval of any public proposition, may be contested" upon one or more of the grounds therein specifically stated and that, except a contest relating to an office or proposition voted for by the voters of more than one county or of the entire state, the contests *shall* be heard and determined by the several Circuit Courts of this state. The procedural instructions are also prescribed.

Nevertheless, some doubt is expressed concerning the intention of the legislature to authorize and require the Circuit Courts to hear contests relating to the election of members of the legislature. Article XXVI provides that "the election of any person to any public office" may be contested upon the

grounds and in the manner therein expressed. In the present statute, "public office" is defined as any office in the government of this state or any of its political subdivisions now or hereafter filled at elections by the electors of such state or political subdivision. Paragraph 1 section 1 (h). The language of article XXVI thus employed is not equivocal and its import is not dubious. If any rational doubt exists concerning the intention of the legislature to include within the operation of article XXVI the election of members of the legislature, it requires no elaborate research to dissolve it. Among the statutory ancestors of our present election law are the revisions of 1876, 1898 and 1920. Other statutes of interest are those of 1846, 1890 and 1894. The statute approved April 16th, 1846, dictated a preliminary procedure to be followed in contesting the election of a member of the senate, general assembly or house of representatives of the United States. It authorized the taking of depositions of witnesses before "judges of the Court of Common Pleas, the commissioners to take bail and affidavits in the Supreme Court, and the masters in Chancery, respectively." The destination of the depositions was indicated as follows: "The officer who shall take any such deposition or depositions, shall certify the same under his hand, and shall enclose, seal up and transmit or deliver the same, in case the intended contest shall relate to a seat in the senate, to the president of that body." The revision of 1876 (*Pamph. L.* 1876, *p.* 163) and the revision of 1898 (*Pamph. L.* 1898, *p.* 237; 2 *Comp. Stat., p.* 2073) required the same preliminary course of action in such cases. In the revision of 1876 the Circuit Courts were empowered to hear and determine contests relating to the election of "any county, township or city officer." In 1894 (*Pamph. L.* 1894, *p.* 205) by a supplement to the act of 1876 the jurisdiction of the Circuit Courts was expanded to embrace contests concerning "the election of any elective officer or officers of any county, city, borough, village, township or other municipality incorporated under any law of this state." This supplementary enactment was embodied in the revision of 1898. The legislature in 1920, presumably aware of the existing state of the statutory law pertaining

to election contests, abandoned the former discriminatory provisions and composed article XXVII of the revision of 1920 in the language which we now find in article XXVI of the revision of 1930. *Supp. Comp. Stat.* 1925-1930, *p.* 605, § 65-2601A.

In *Carson* v. *Scully,* 89 *N. J. L.* 458, 464; 99 *Atl. Rep.* 199, Mr. Justice Kalisch, in commenting upon the evolution of the statutory law concerning the recount of votes, stated:

"This broad design would be seriously impaired if it were permitted upon unsubstantial or technical ground to add to the statutory words 'any candidate at any election' the words 'for state senator, member of assembly or county or municipal office.' The act, as it originally stood (*Pamph. L.* 1880, *p.* 229), did so limit is provisions to 'any election in this state for member of the senate or member of the assembly,' and by *Pamph. L.* 1895, *p.* 659, this was changed to 'any candidate for any office,' and, finally, by *Pamph. L.* 1898, *p.* 310, changed to 'any candidate at any election.' Some significance must be given to these changes."

The late Chancellor Walker in expressing his views in the same case on appeal (90 *N. J. L.* 295, 299; 101 *Atl. Rep.* 295) said:

"The popular and generally accepted meaning of language is to be applied to the construction of a statute in the absence of a legislative intent to the contrary. *Conover* v. *Public Service Railway Co.,* 80 *N. J. L.* 681. The word 'any' means 'one out of many' * * * and is given the full force of 'every' or 'all.'

"Now, it must be perfectly obvious that when the legislature, in section 159 of the present act concerning elections, said that any candidate for any office might have a recount, it meant what it said. The words define themselves and there is no room for construing them contrary to their plain and ordinary meaning. I start, therefore, with the proposition that the legislature meant to give a recount to a candidate in a congressional election." "And, by the way, how do candidates for county and municipal offices derive their right to a recount? It is not because they are named in section 159. Yet, nobody will deny that they have the right. It is

derived from the language 'any candidate at any election.' If this language applies to the case of a surrogate of a county and to the mayor of a city, and, certainly, it does, it equally applies to congressman."

In determining that the statutory recount of votes was applicable to elections of city commissioners under the Walsh act, Mr. Justice Kalisch stated:

"The legal effect of this pronouncement was the establishment of a statutory principal or policy to govern all elections to be held in the state." *Monahan* v. *Matthews,* 91 *N. J. L.* 123, 127; 103 *Atl. Rep.* 40.

Reverting, then, to article XXVI of the statute with which we are here concerned, we likewise find from an examination of its roots and from an observance of the clear language employed, a legislative intent to supply, as a part of the electoral machinery, a universal course of action by which "the election of any person to any public office" may be contested.

It is also argumentatively asserted that some of the provisions of article XXVI are patently inapplicable to an election of a member of the legislature, notably those provisions relating to the enforcement of the judgment. Paragraph 364, section 10. *Supp. Comp. Stat.* 1925-1930, *p.* 608, § 65-2610A. The following excerpt taken from the opinion of Mr. Justice Dixon, in *Gage* v. *Clark,* 51 *N. J. L.* 97, 99; 15 *Atl. Rep.* 831, has pertinency:

"A further argument is presented by counsel for the prosecutor, based upon the provisions of section 111 of the statute, to the effect that a successful contestant shall be 'entitled to his certificate,' and 'the certificate of election' of the defeated incumbent shall be annulled. Counsel contends that these provisions are inapplicable to justices of the peace, because they do not receive certificates of election, and, therefore, these officers are not embraced in any part of the law.

"But we think this conclusion is too broad for the premise. The formal annulment of an old certificate and granting of a new one are quite unimportant for any useful object at which the law aimed. It would be an unreasonable interpretation of the statute to confine its substantial enactments within

the limits of these purely formal provisions. It is much more rational to assume that the legislature intended to give full effect to what was important, and overlooked the fact that what was in all cases immaterial was also sometimes inapt."

Even assuming that the decision of the Circuit Court in a contest relating to the election of a member of the legislature is merely tentative or advisory and subject to review, modification or annulment by action of the particular house of the legislature as the ultimate judge, yet it is not perceived how the Circuit Court can ignore the prime object of the statute to which I shall presently advert or escape the performance of a so-called ministerial duty imposed by the statute.

"The duties of the Circuit Court in carrying out the provisions of article 26 of the act are ministerial, and are employed as an electoral adjunct." *Van Winkle* v. *Caffrey, supra.*

The constitutionality of statutes conferring upon the judiciary the power to hear contests relating to members of the legislature has received consideration in several of our sister states where similar constitutional provisions exist. Some diversity of reasoning is noticeable. *Dinan* v. *Swig,* 223 *Mass.* 516; 112 *N. E. Rep.* 91; *State* v. *Gilmore,* 20 *Kan.* 551; 27 *Am. Rep.* 180; *State, ex rel. O'Donnell* v. *Tessot,* 40 *La. Ann.* 598; *State, ex rel. Smith* v. *District Court,* 50 *Mont.* 134; 145 *Pac. Rep.* 721; *Southerland* v. *Miller (W. Va.),* 91 *S. E. Rep.* 993; *L. R. A.* 1917, D 1046; *Rhode Island* v. *South Kingston (R. I.),* 22 *L. R. A.* 65; *In re Election of McNeill,* 111 *Pa. St. Rep.* 235, are illustrative.

But in undertaking to determine this particular issue in our own state, this court is not compelled "to chop out an original path through the wilderness." A study of the reported opinions in the adjudicated cases of our own state in which the same or analogous subjects have been treated, leads irresistibly to a conclusion adverse to the present contention of counsel for the incumbent.

The words of that discerning jurist, Chief Justice Beasley, may be aptly recited. They are extracted from his opinion

in *Conger* v. *Convery*, 52 *N. J. L.* 417, 443, 444; 20 *Atl. Rep.* 166, in which case it was argued that the functions of the Circuit Court (election contest) sought to be conferred by the statute are judicial in character and constitute an unwarrantable intrusion upon the powers of the Supreme Court.

"But upon full consideration, it has been concluded by me, that the fundamental fact thus argumentatively assumed does not exist; that is to say, this act under consideration, when properly construed, does not transfer to the county Circuit Court any part of that prerogative power of this court of which we have been treating. The procedure which it establishes is to be regarded simply as a part of the apparatus for organizing the government, by supplying it temporarily, and in view of a pressing public necessity, with its necessary members. In its purpose and nature it is similar to the power exercised by the judges of election and the county canvassers. It may, in fact, be said to be a supplement to such machinery, the object of it and the other agencies just referred to being the same—that is, to put into office for the time being such candidates as appear to have been chosen by the people.

"This construction excludes, of course, the idea that the procedure has any conclusive effect, and regarding it in this light it appears to be, in a constitutional point of view, unobjectionable, at least so far as it is employed merely as an electoral adjunct. Plainly, the judgment rendered in such procedure would not oust this court of its jurisdiction subsequently to try the title to the office by *quo warranto*. Indeed, no case has been observed in which it has been declared that a decision of this kind, settling for immediate purposes and as a part of the electoral process with which it was intimately connected, the right to office, is a bar to further judicial inquiry. The doctrine of the inconclusiveness of such decisions in these cases, is approved by Judge McCrary in his excellent treatise on Elections, section 360."

Again, in *Darling* v. *Murphy*, 70 *N. J. L.* 435; 57 *Atl. Rep.* 263, the Supreme Court held that the proceedings (election contest) are not a substitute for the proceedings by *quo*

_warranto_ to try the title to the office but are merely a part of the electoral machinery.

In Ruh _v._ Frambach the Supreme Court was concerned with a petition for a writ of prohibition to restrain one of the justices of the court from revoking in a recount proceeding the certificate of election which had been theretofore issued to the petitioner, a candidate for member of the assembly. The following passage is taken from the opinion of the Supreme Court:

"The legislature have the power to determine the source from which the certificate of election shall issue, but the house of assembly being by the constitution the judge of the election of its own members, can go behind the certificate whether issued by a board of canvassers or by order of a justice of the Supreme Court, and finally decide who is entitled to the seat. The result of a recount cannot take from the house the constitutional right of seating the member in fact elected, although, as in this case, it may reverse the position of sitting member and contestant. The legislature could not invest a justice of the Supreme Court with the power of determining the election of a member of assembly. The duties of the justice who makes the recount under the law are only ministerial."

Also for exemplification _Weeks_ v. _Kip,_ 64 _N. J. L._ 61; 44 _Atl. Rep._ 856; _Lippincott_ v. _Felton,_ 61 _N. J. L._ 291; 39 _Atl. Rep._ 646, and _Kehoe_ v. _Stagmeier,_ 70 _N. J. L._ 175; 56 _Atl. Rep._ 252, may be cited.

It is evident that with regard to the election of members of the legislature the object, broadly stated, of a recount and an election contest is to _initially_ ascertain the legal votes actually cast at the election and to _initially_ determine the candidates for whom the majority of such votes were cast. The electoral procedure is made adaptable to the circumstances and when pursued it is productive of _prima facie_ evidence of the title of the candidate to the office. In election affairs, the certificate of election, when issued, is accorded this limited evidential force. In Conger _v._ Convery it was cogently argued that "so far as the state is concerned the whole effect is to make the judgment of the Circuit Court

for the contestant *prima facie* evidence of title, of the same weight and no more, in *quo warranto,* as the canvassers' certificate was before it was annulled."

In considering the constitutionality of such legislation, the capacious range of our election laws and their manifest design and purpose cannot escape recognition.

The earnest desire to insure fair and honest elections has for many years produced a ferment of constructive and progressive ideas and has truly challenged the creative energies of legislators in states and nations. Laws once thought adequate became pathetically inadequate. The process of perfecting has continued to the present day. A public election bears such a vital relationship to a representative form of government that it must be supervised and governed as an institution for the welfare of our citizens. It is sometimes said that it is natural for us to take certain evils for granted and there are those who seem to confidently surmise that corrupt practices have always to some degree invaded public elections. Vested wrongs of this character, if such exist, should never be regarded by any court as vested rights. Assuredly, those who are called upon by statute to help operate the election machinery ought not to conclude that a fair and honest election is an aspiration too lofty to achieve. The legislature has outlawed almost every conceivable corrupt practice and fraudulent activity in our elections. It is idle, however, to entertain the notion that the force of law is so great that the mere enactment of a prohibition of such evils will of itself accomplish the desired end. The law, when enacted, will not execute itself. It requires the active interposition of those responsible for its enforcement. To condone violations of such laws will inevitably produce incalculable evils. Conduct will forever follow the prevailing standards. Unfortunately, posterity inherits and oft reproduces vices as well as virtues. The honest, loyal and patriotic citizen, however, will not long submit to the nullification of his vote by means of the illegal vote of some unscrupulous floater or by reason of the willful misconduct of election officers. He will not complacently witness the prostitution of honest government to the advancement of the few at the expense of the

many. Fraudulent, corrupt and illegal practices may leave no trace discernible by an examination and recount of the official ballots. Obviously, the legislature did not intend these inimical practices to be exempt from exposure. To the contrary, a justice of the Supreme Court and the Circuit Courts, as the case may be, have been invested with suitable power and authority to ascertain the facts. The form of procedure and the grounds of contest have been written down, all of which clearly illuminates the indubitable intent of the legislature. The object to be attained is one of grave importance. It is not difficult to see both the bane and the antidote.

"That the errors, frauds, irregularities and illegalities which not infrequently attend electorial procedures of this sort, conducted and presided over, as they generally are, by political partisans, should be placed under the corrective supervision of the courts, was reasonable enough." *Ellingham* v. *Mount*, 43 *N. J. L.* 470, 472.

The statute should be liberally construed and interpreted to the end that a thorough investigation may be had in those voting districts where causes of contest, recognized by the act, are presented in specific form in a petition duly verified. *Burrough* v. *Branning*, 9 *N. J. L. J.* 116. The exposure of malconduct, fraud or corruption in the election of public officials or the refutation of such a charge, is essential to the public welfare and every court clothed with appropriate jurisdiction should incline to lend its aid to such an undertaking. The election contest is in reality a step in a systematic series of operations designed to insure fair and honest elections and to produce true conclusions and results. The fact that the proceeding, when enveloping the election of a member of the legislature, has no conclusive effect tends to support its constitutionality; the circumstance that the proceeding is merely a step in the election operations refutes the contention that it encroaches upon the power properly belonging to the legislature.

Moreover it is the law, too well settled to require the citation of authorities, that courts will presume in favor of the constitutionality of a statute and will incline to a construction of the statute compatible with its validity. A statute

will not be held unconstitutional, unless its alleged violation of the fundamental law is clear and palpable.

The jurisdiction of the court is also assailed upon grounds more technical in character. It is asserted that the failure of the contestants to affirmatively prove at the hearing that the petitioners, or at least fifteen of them, were legal voters of the county, leaves this court without jurisdiction to pronounce any conclusion.

To originate the contest, the statute requires the approval of the bond and the filing of a petition with the county clerk, "signed by at least fifteen voters of said county." The petition must be verified by the oath of at least two of the petitioners and "the verification may be made on information and belief." The amended petition in the present proceeding is not criticized. The insistence is that the contestants are obliged to establish at the trial by competent proof that the petitioners were in fact voters of the county. Not necessarily. Undoubtedly the justice or judge, upon the presentation of the petition, if reasonably suspicious of an unwarrantable imposition upon the court, may demand more satisfactory proof of the essential qualifications of the petitioners. Moreover, the indispensable qualifications of the petitioners need be proved at the hearing, if and only when their qualifications are challenged and drawn in controversy in an appropriate and formal manner. *Davis* v. *Repp,* 79 *N. J. L.* 394; 75 *Atl. Rep.* 169.

Suffice to state that in the impending case no such issue was created by any answering pleading (*Burrough* v. *Branning,* 9 *N. J. L. J.* 110) and no effort was made in behalf of the incumbent to challenge the alleged fact either by the offer of testimony in contradiction thereof or otherwise. *Park Ridge* v. *Reynolds,* 74 *N. J. L.* 449; 65 *Atl. Rep.* 990; *Allgair* v. *Blew,* 82 *N. J. L.* 7; 81 *Atl. Rep.* 563. There is therefore no sufficient basis for the jurisdictional question here sought to be projected.

The next point with which the jurisdiction of the court is challenged is exceedingly legalistic in character. The argument clearly tends to exaggerate the letter and to debase the spirit of the law. It is asserted that William C. Hunt is not

in fact the incumbent in that the board of county canvassers, manifestly under a misconception of an order of this court, "crossed off" the name of William C. Hunt from the certificate executed by the chairman of the board. All substantial merit fades from this point when it is noticed that the board of county canvassers under date of November 9th, 1936, prepared and filed with the secretary of state a statement entitled "A Statement of the result of an election held in the county of Cape May on the third day of November, Nineteen hundred and Thirty-six to elect a member of the State Senate, one member of the General Assembly and the following county Officers: Coroner and two members of the Board of Chosen Freeholders." The county canvassers certify that the statement is a true, full and correct statement of the results of the election mentioned, as exhibited by the returns laid before them and that the statement likewise reveals the whole number of votes cast for each person for each office designated. Article XVIII, paragraph 232, section 8; paragraph 233, section 9; paragraph 234, section 10. *Supp. Comp. Stat.* 1925-1930, *pp.* 567, 568, §§ 65-1808A to 1810A. The statement of the result discloses that William C. Hunt received eight thousand seven hundred and sixty-seven votes and Jesse D. Ludlam received eight thousand three hundred and thirty votes.

The term "incumbent" is defined in article XXVI. *Supp. Comp. Stat.* 1925-1930, *p.* 605, § 65-2601A. It is to be taken to mean the person whom the canvassers declare elected. In article III, paragraph 11, section 4 (*Supp. Comp. Stat.* 1925-1930, *p.* 494, § 65-304A), it is stated: "At every election the person or persons, to the number to be elected therein, who shall by law be qualified for the office or offices to be filled at such election, and *for whom the greatest number of votes shall have been given therein for such office* or offices, shall be deemed and taken to be elected to such office or offices." It becomes at once obvious that the county canvassers from the official returns declared that William C. Hunt received the greatest number of votes for the office of state senator. This in so far as the authority of the board of county canvassers extends, is legally equivalent to a declaration that

William C. Hunt was elected. The board of county canvassers can only determine the votes cast from the statements produced by the clerk. *The State* v. *the Governor,* 25 *N. J. L.* 331, 348; *State* v. *Common Council of Rahway,* 33 *Id.* 111, 113; *Love* v. *Freeholders of Hudson Co.,* 35 *Id.* 269, 277; *Darling* v. *Murphy,* 70 *N. J. L.* 435; 57 *Atl. Rep.* 263.

The final contention of a legal nature urged upon me by counsel for the incumbent is that this court lost jurisdiction over this proceeding when the senate on January 12th, 1937, adopted a resolution to inquire into and investigate the election to which this contest relates. It is significant to recall that no proof was submitted to this court that the senate had judicially determined that Mr. Hunt was duly elected to the office of senator. Since this proceeding is to be truly regarded as merely a requisite step in the election operations, then admittedly it has no such final and conclusive effect as to interfere with the full and free investigation of the legal result of the election by the senate. *State* v. *the Clerk of Passaic,* 25 *N. J. L.* 354, 356. Assurance was promptly given that the hearing of this contest would not be permitted to occasion any interference with the proposed investigation of the election by the senate. This court had no inclination, as Judge Cooley phrased it, "to run a race with the legislature."

The conclusion is that, in the existing state of the law, the mere circumstance that the senate declared by resolution its intention to investigate the election did not of itself either eradicate the duty imposed upon the Circuit Court or constitute sound legal justification for the court to abandon the pending proceeding.

It is not now necessary to definitely pass upon the authority of the Circuit Court to restrain *pendente lite* the issuance of the certificate of election by the county board. In the present proceeding such restraint was provisionally granted with the express understanding that a motion to modify or vacate the order in this particular would be heard and considered at any time. No such motion was promptly made. The question is now merely academic and no opinion concerning it is expressed.

Our attention may now be transported to the factual branch of this proceeding. In the study of this branch of the case it has been essential to contemplate relatively (1) the alleged grounds of the contest; (2) the facts and circumstances adequately established by the credible evidence as well as the logical inferences to be confidently drawn therefrom and (3) the efficient and practical effect of the settled facts upon the previously announced result of the election.

It is needless to augment this memorandum by a reproduction here of all the grounds specified in the statute. A statement of those statutory grounds invoked by the petitioners in this contest is sufficiently explanatory. They are: I. Malconduct, fraud or corruption on the part of the members of any district board * * * sufficient to challenge the result; V. When illegal votes have been received * * * sufficient to change the result; VII. For any other cause which shows that another was the person legally elected.

Moreover the lengthy allegations of the amended petition cannot be expediently related here. It need only be said that the amended petition adequately alleges the three statutory grounds mentioned.

Likewise, it must be immediately acknowledged that a recitation of all of the pertinent and significant testimony adduced at the hearing of this contest cannot be undertaken with facility in a memorandum of reasonable proportions. Such would necessitate an extravagant expenditure of words. All of the testimony has been studiously and deliberately reviewed and the ensuing discussion of it serves only to contribute to an understanding of the facts and circumstances which lead to the one inevitable conclusion.

An examination of the official returns for the entire county reveals that Hunt received a majority of four hundred and thirty-seven votes. The elections in Wildwood, North Wildwood and West Wildwood are contested. It is interesting to canvass the returns of all election districts of the entire county exclusive of those to which the contest relates and to ascertain that result. A canvass of the vote of all such districts produces a majority of one thousand two hundred and ninety-eight for Ludlam. The official returns disclose that Hunt

received in the Wildwood districts alone a total majority of one thousand seven hundred and thirty-five votes. His highest majority in any other municipality in the entire county was one hundred and thirty-two votes in Wildwood Crest. Ludlam carried such municipalities as Ocean City by four hundred and twenty-six; Middle Township by six hundred and fifteen; Dennis Township by two hundred and seventy-six; Woodbine by one hundred and seventy-five. These observations would ordinarily carry no particular significance if it were not for the proof to which reference is to be presently made.

A chronological narrative of the facts established by the evidence in this contest might well begin with events anterior to the primary election in May, 1936, but it will be more expeditious to subsequently advert to them.

The statement of the facts may therefore prudently begin with some introduction to the persons and places receiving frequent mention. Richard Gownley, commonly known as Chester Dick, is said to be the "Excise Commissioner" of the city of Wildwood. He has fled or is otherwise in seclusion. Mae Lloyd is a colored woman at whose house in Wildwood the colored boys from the Tuckahoe C. C. C. camp and others congregated. She has likewise sought solitude elsewhere. One Jack Wilson is said to have absconded. Mae Wolf is the proprietress of a cafe, restaurant and hotel situate at Susquehanna and Rio Grande avenues in Wildwood. Joseph Anderson is a bartender residing in Philadelphia with whom Chester Dick was evidently intimate. The Blackstone Hotel is located at 234 East Cedar avenue and the Lyndhurst Hotel is at 236 East Cedar avenue.

It must be at once realized that in the practical introduction of a large body of evidence, the proof of an alleged factual situation remains, at the close of the case, in a somewhat fragmentary form. In the effort to ascertain the truth it is often an efficient practice to gather all of the fragments and ascertain whether or not these detached portions of the evidence when brought into contact, form a complete and harmonious recital of events. Let us subject this case to this same process.

The activities of Chester Dick immediately before election first attract our notice. We see him in October interviewing Mae Wolf concerning the use of her hotel. On October 20th, we discover him conversing with Russell McDonald to enlist his aid in soliciting some "floaters" from Philadelphia. On the Thursday before election we observe him accompanying McDonald to Philadelphia on this mission. Two days before election Dick visits the home of William Lindsay to arrange for the clerical services of the latter at the Mae Wolf Hotel on election day. On Monday, November 2d, Dick and McDonald go forth to find floaters. Dick remains at Millville while McDonald proceeds to Philadelphia in the car of Leo McGraw who was perhaps fortuitously at hand. We learn that Dick at some time before election likewise induced Joseph Anderson to arrange for the presence of some female floaters. It was Anderson who arranged for the attendance of Marion Ellis, Mildred Ervin and Rose D'Amato. It is known that on the night before election, and after midnight, the three young women already mentioned and six of the men procured by McDonald were afforded accommodations at the Blackstone Hotel in Wildwood. On the morning of election day Dick told McDonald that there were other floaters at the hotel.

The testimony takes us, on the morning of election day, to the hotel of Mae Wolf. Mae Wolf herself describes the first floor. "There is a large dining room on the left-hand side of the building; there is a small room in back of that. On the right-hand side there is a bar and in back of that is an oyster bar and in back of that is the kitchen." When Marion Ellis, Rose D'Amato and Mildred Ervin are taken there for breakfast at about ten o'clock in the morning, they meet about twenty-five or thirty others. Mae Wolf, who served and charged for the breakfasts, states that she furnished twenty-five breakfasts to those then present. Shortly thereafter William Lindsay arrives carrying a brief case. He takes a chair at the table in the small room. A man unknown to him is seated beside him. Lindsay then has a list of two hundred and twenty-five names handed to him by Chester Dick. His companion at the table has a stack of cards, each

of which is about two by five inches in dimensions and upon one side of which the names of the Republican candidates are printed. Evidently, cards prepared for circulation during the campaign. Additional sheets of paper are prepared, having at the extreme left a column in which the election districts are separately designated, then additional columns over which are the names of individuals such as "Pat," "Jake," &c. The witness Duncan, when required to do so at the hearing, made a detailed drawing of such a sheet for illustration and elucidated its utility in recording the districts to which each floater was, from time to time, dispatched. The company at Mae Wolf's increases. Chester Dick arrives. "Chester Dick told them to start up," says McDonald. Dick then addressed the assemblage. It is the recollection of Marion Ellis that he said, "Put a cross beside the name Hunt and the hell with everyone else on the ticket." Others present, who have testified, have a like recollection of the instructions. Dick is also heard to say to those present, "Don't worry about the boards." "Don't worry, everything is all right. You won't get in any trouble." The so-called floaters, as summoned by name, approach the table in the little room where Lindsay addresses them in the following language: "Here, take this card, memorize the name and address on the back of it. This fellow here will drive you to the polling place." It is asserted that not infrequently a floater would exclaim, "give me an easy name, something I can spell." There was soon "a lot of activity." The witness Anderson, for example, was asked to explain what he meant by "activity." He replied, "these gentlemen were congregated, they were idle, talking among themselves and in groups, and from time to time they were called upon, and given cards and sent out to vote." He was asked, "did that go on during all the time you were there?" He replied, "yes." "What time did you leave Mrs. Wolf's, Mr. Anderson?" He replied, "about six o'clock." The witness Gressen states "they were receiving cards from Mr. Lindsay, going back and forth in cars all day long." At about four o'clock in the afternoon Dick remarked to Gressen "that he had from seventy-five to a hundred more votes to put in." Gressen testifies that "every time they

[floaters] went out and came back they handed the cards in." Several witnesses testified that Dick was in frequent conference with Lindsay at the table although Dick also, it is said, was "very busy" and "in and out." The witness Wilkin, who received $12 from Chester Dick for transporting five of the men from Philadelphia, remained just outside of the Wolf hotel during most of the day. He observed "cars around there." "Carrying passengers from inside of the hotel." "They would then go away and come back and they would carry the same people back that they carried away." "And how long would they be away?" "Maybe fifteen minutes, twenty minutes." The witnesses Patterson and Anderson observed as many as ten cars available for such use. Wilkin noticed that one car bore an "MG" license plate.

Several of those who actually participated in the mischievous practice of personating voters were apprehended. From them it is learned that at this election Marion Ellis illegally cast five votes; Mildred Ervin likewise voted five times; Robert Patterson contributed five votes; Harry Gouck cast five ballots, although he was taken to the polls seven times; Harold Gressen accounts for two votes; Russell McDonald voted twice. All of these floaters were among those colonized at the hotel of Mae Wolf and all have testified that they voted for Hunt.

The witness Marion Ellis, twenty-two years of age, offered the following explanation:

"They told me to vote for the people that were already registered that commuted in Philadelphia every day and they weren't down there and wouldn't be able to vote and I would be doing them a favor if I used their name and went and voted for them."

On cross-examination she was asked,

"Well, why did you stop at five times, if it was proper? Why didn't you go on to fifty?"

She promptly answered,

"Chester Dick didn't have any more names to give out."

The total number of men and women who congregated at this hotel has been variously estimated but in this particular, predominate reliance may best be reposed in the testi-

mony of the proprietress herself. The following excerpts from her testimony are informative:

"*Q*. What time on election day did you have this discussion with him? [Chester Dick.] *A*. Nine o'clock in the morning. *Q*. Did you discuss the number of dinners you would have to prepare? Tell us what you talked about. *A*. I asked him how many he thought I should prepare for and he said, 'Oh, I don't know; seventy-five or eighty.' He said, 'I can't tell you, but you won't get stuck.' In fact, I thought probably I would get stuck with a lot of food."

\*     \*     \*     \*     \*     \*     \*

"*Q*. How many did you serve breakfast to? *A*. They started coming in and I served twenty-five."

\*     \*     \*     \*     \*     \*     \*

"*Q*. Were all of the twenty-five or approximately twenty-five who had breakfast strangers to you, Mrs. Wolf? *A. Yes.*"

\*     \*     \*     \*     \*     \*     \*

"*Q*. Do you know how many dinners you served that day? *A*. Yes. *Q*. How many? *A*. Seventy-two. *Q*. How would you know that, Mrs. Wolf? *A*. Because I kept tab on them."

\*     \*     \*     \*     \*     \*     \*

"*Q*. To how many would you say you served sandwiches? *A*. I couldn't say, but around twenty-five sandwiches."

To envisage the deportment and appearance of those constituting this aggregation of unscrupulous men and women, we can again resort to the testimony of Mrs. Wolf.

"I told him [Chester Dick] it placed me in a bad position. I objected to it." "I objected to some of the type." "Some were very nice." "I was glad to see them leave."

Several witnesses were asked how many times they had observed any one person or group of persons receive cards, leave the hotel and shortly return. In most instances the witnesses estimated the number of times to be four, five or six. Lindsay, who was in charge of the list of names until about two-thirty in the afternoon, believes that he "checked off" approximately one hundred and fifty names. Duncan assumed charge of the lists between twelve-thirty and one

o'clock to enable Lindsay to eat his lunch. Duncan was not compensated and as he himself expressed it, "I just stuck my nose into a place where it didn't belong."

Liquor was apparently dispensed without charge. The price paid by Chester Dick to each known floater at the Mae Wolf hotel was $5. Wilkin received $12 and Anderson, after making some disbursements, retained $24 for himself. The payments were made directly or indirectly by Chester Dick.

The foregoing is, of course, only a distant panoramic view of the activities at the Mae Wolf hotel in Wildwood up to the time, late in the day, when Chester Dick announced, "the law is here. Everyone get out." When Gouck was taken to the polls for the seventh time, someone informed the driver of the car, "it is too hot; don't go in there; the sheriff is in there."

The testimony is replete with significant details concerning the movements at the Wolf hotel. The details must, of course, remain unmentioned in this memorandum. In major particulars, the verifying testimony comes not alone from one, but indeed from several witnesses. The evidence to which I have already referred sheds light upon a shadowy field of fraud and corruption. It at least exhibits a scheme of colonization and impersonation as audacious as it was unscrupulous. Nevertheless, no evidence whatever was introduced in behalf of the incumbent to controvert or even challenge the proof relating either to the importation of the floaters or the occurrences at the hotel. The evidence remains uncontradicted.

The testimony now leads us to the house of one Mae Lloyd, also in Wildwood, and to the "real large room" facing Arctic and Montgomery avenues. It is here, according to the witness Brown, that thirty or forty colored people have collected. One Josephine Wright is seated at a desk. It is from her that we learn that at nine o'clock on the morning of election day she began to write down names given to her by Mae Lloyd. Mrs. Wright states, "the people went to the polls and voted and they came back and they gave me a ballot number and I wrote that down, until about twelve o'clock, and after that I waited on tables." Two or three days before election James

Griffin was told by his employer that two of his buses had been chartered to transport boys on election day from the C. C. C. camp at Tuckahoe to Wildwood. Only one bus, however, was so used. Griffin was the driver and Edwin Patrick accompanied him. In this bus about fifteen boys were conveyed from the camp to the house of Mae Lloyd. Patrick received $10 for his services on election day.

It was from this headquarters that Brown, a resident from Philadelphia, voted under the name of Leroy Walker. John Caldwell, a resident of Dorothy in Atlantic county, voted in his own name but is unable to remember the address given him. He was cautioned "to remember the name, Hunt." Charles Tucker, a resident of Bridgeton, was admonished by Mae Lloyd to "make sure you vote for Hunt." Clinton Blount, of Atlantic City; Alexander James, of White Plains, New York, and George Christian, of Jersey City, also testified relative to the occurrences at the house of Mae Lloyd. Alexander James and George Christian voted. All of those mentioned assert that they voted for Hunt. The price of a vote at this market appears to have been $2 and one "Reds Maxwell" disbursed the cash.

In point of efficiency and volume of accomplishments, the combination at Mae Lloyd's would seem to have been only a small model of the machine in operation at Mae Wolf's. Here again, the transcript of the testimony will be searched in vain to discover any divergent or contradictory evidence. Neither Reds Maxwell nor the husband of Mayor Bradway, who is said to have obtained lunch there, were called as witnesses. Mae Lloyd has disappeared.

In my analysis of the evidence I have regarded it important to ascertain the circumstances, if any, that would be productive of the inference that these floaters actually visited the polls and voted. The following may be extracted from the testimony of Robert Patterson who, in undertaking to vote, was obliged to stand in line.

"Q. About how many were in the line? A. I would say about fifteen. Q. Did you recognize any of these people as people you saw at Mae Wolf's? A. I did. Q. About how many? A. A great number of them. I wouldn't say how

many, but quite a number of them I had seen at Mae Wolf's place."

Mildred Ervin and Marion Ellis, while at the polls at North Wildwood, recognized eight others from the Wolf hotel. Gressen testified that he recognized five or six in line on one occasion when he was at the polls. Duncan says that Chester Dick was habitually interrogating the voters concerning the districts in which they voted.

This evidence has a tendency to justify the reasonable inference that at least most of these floaters on most occasions succeeded in actually casting a ballot, but if this evidence remained unaccompanied by other evidence of a more convincing probative force, I would hesitate to draw from it alone the inference that the floaters actually deposited ballots in the election boxes. Who cast the votes under the numerous names of unidentified, non-existent and unknown registrants? For what reason need hundreds of names be added to the registry lists on election day without affidavits as required by law? In this very connection these questions seem powerful.

The thought at once arises that to effectuate such a scheme of imposture and fraud, names must be available on the registry lists under which the floaters may cast their illegal votes. The discovery of fictitious names in the registry books has a persuasive tendency toward the inference that such fictitious names were in fact utilized to effectuate the apparent fraudulent purpose. The evidence displays an astonishing number of names of fictitious, non-existent or unknown persons recorded in the registry books. Wildwood, North Wildwood and West Wildwood are not relatively large communities. The total number of both genuine and fictitious names on the poll books of Wildwood is only three thousand four hundred and sixty-four; the total in North Wildwood is one thousand three hundred and seventy-nine, and in West Wildwood it is one hundred and sixty-one. Nevertheless it seems apparent from the exhibits that eight hundred and eleven persons registered and voted in the districts of these three municipalities on election day. It is of importance to note that five hundred and eight-eight persons of the eight hundred and eleven

caused themselves to be registered contrary to law and appear to have voted.

Moreover, the amended petition contained several hundred names therein alleged to be either fictitious or the names of non-resident or unknown persons. The petitioners submitted evidence which in a *prima facie* degree conduced to the conclusion that numerous persons so styled in the registry books were not residents of the municipality. This proof came largely from postmen or letter-carriers who had for many years in the pursuit of their occupation covered their respective routes daily and had, of course, delivered mail from house to house. Many of these letter-carriers have been thus engaged for many years, for example, Weaver for twenty-four years; Taylor, seventeen years; Filer, twenty-four years; Clunn, twenty-three years; Nineviller, twenty-four years; Grace, fifteen years; Hogan, twenty-two years; and Ewan, seventeen years. Objection was interposed to the introduction of this testimony because it was merely negative in character. Such testimony was clearly competent.

"In applying the foregoing principle requiring that a witness' inferences be based on adequate data, courts have often been asked to exclude testimony based on what may be called negative knowledge, *i. e.*, testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred. But there is no inherent weakness in this kind of knowledge. It rests upon the same data of the senses. It may sometimes be stronger than affirmative impressions. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred. This sort of testimony is constantly received—particularly in proof of the failure to give railroad signals, the loss of a chattel, the absence of a witness, the *non-existence of a fictitious person* [italics mine], the non-payment of money and other negative facts." 1 *Wigmore Ev.* 1068.

The probative influence of testimony of this nature is to be cautiously determined. If, however, the names concerning which these postmen were interrogated were in fact the names

of even summer residents of the districts in which they were registered, it would seem entirely possible for the incumbent to have either produced the individuals themselves or witnesses capable of establishing their identity. The incumbent has apparently been unable to prove the existence or residences of at least one hundred and seventy-five of the alleged persons about whom the postmen were questioned. The petitioners claim the figure to be one hundred and eighty-eight, and that the testimony concerning the identity of fifty-nine more is incredible. The effort was undertaken in behalf of the incumbent to adduce evidence concerning all of the names stated in the petition. At the close of the hearing there were approximately four hundred and ninety names unmentioned by the incumbent's witnesses.

It is to be understood that the one hundred and seventy-five names previously mentioned are not among the five hundred and eighty-eight which appear to have been added to the registry books on election day.

Even in this posture of the proof one cannot, of course, safely calculate mathematically the number of illegal votes actually cast by floaters, yet the circumstances reveal that the conspirators were equipped on election day with both mercenary floaters and registered names. In the light of the evidence, opportunities were assuredly at hand which Chester Dick and his associates would not scruple to exercise.

The conduct of the district election boards now merits attention. At the outset it is desirable to state that the evidence upon this subject has related to the actions of the district boards as boards and not always to particular members. The conduct of each member cannot be separately considered in the existing state of the evidence. The collective action is here under review.

We have already heard Chester Dick pacify the floaters with the remark, "don't worry about the boards." Were the election boards so flexible that they could be adjusted to the fraudulent purpose? The answer must be captured from the evidence. The statute requiring personal registration exempts therefrom the municipalities with which we are here concerned. The district boards are obliged to make a house-to-

house canvass. If such were done, the existence of so many so-called fictitious names upon the canvass and registry books is inexplicable. For example, we hear a member of the board of the first ward, third district, of Wildwood seriously state that "a very conscientious house-to-house canvass" was made and yet in this district twenty-eight names appear on the canvass books which neither the incumbent nor the postmen could attach to any living resident of the district. It was in this district that one George Williams, deceased, from the tomb, voted ballot 151 at the May primary and arose again from the sepulcher to vote ballot 365 at the general election. A considerable number of names of unidentified persons also appear on the canvass books of the second ward, first district, and second ward, second district. Some floater evidently inherited the name of Lloyd Simmons, who died on February 27th, 1936. A vote was cast under this name at both the primary and general elections. The fact that the house-to-house canvassing was so efficiently performed as to produce more names than there were lawful voters arouses doubt that it was governed by good conscience.

On the eve of election a meeting was to be held at the city hall to which the members of the district boards were invited. The prosecutor of the county and others were to address them. Albert Ward was a Republican member of the board in the first ward, third district of Wildwood. He had been invited to attend the meetings. Early in the evening Mr. Neill, a fellow member of the board, requested Ward not to attend the meeting. Ward disregarded the request. The subject of fraudulent voting was under discussion at the meeting. Ward enthusiastically volunteered some appropriate information. Gorman, appearing somewhat displeased, said, "you really know of any fraudulent votes in the first, third?" We hear Ward reply, "does a duck swim? In my particular square a house has been vacant and votes has been cast from there. If you will look at the canvass book at James Agnew, that is the particular house and that is the particular vote. That is only three doors from my own house." The full story cannot be recited but Ward during the night was removed from the election board. A vote was cast in the name of James

Agnew on election day and notwithstanding the significance of this incident, the incumbent introduced no evidence to identify James Agnew and some others supposedly registered from the house mentioned. The subject of fraudulent voting had evidently been agitated, yet before eight o'clock on the morning of election day we observe Mayor Bradway at the polls in the third ward, third district. Mr. Nickerson, a member of the district board, recounts the mayor's remarks as follows:

"She came in and said that she had understood that there was a meeting held the night before of the county board of elections and some of the election officers and that the county board of elections had instructed them that if there was any votes they were in doubt of or the residences, and the question came up whether the person lived at the address they were giving, and the board wasn't satisfied with it that way, what they should do would be to send a challenger or a watcher, one from each political party, to that address and ascertain whether it was true or not, whether the person was a legal voter, and she said she wanted it distinctly understood that they were paying those challengers, and she snapped her finger toward those on the side of the room and she said she positively prohibited them from leaving that room that day."

It is not amiss to ascertain from the testimony how long the members of these boards have resided in the community. It has a bearing upon the range of their acquaintance with the residents of the community. In the first ward, third district of Wildwood, two members had resided in the district more than fifteen years; in the second ward, first district, two members had resided in that district for more than seven years; in the second ward, second district, one member had been a resident of Wildwood for twenty-six years, another for fifteen years and a third for ten years. At least one hundred votes in these three districts were cast in the names of unknown persons according to the uncontradicted evidence and notwithstanding a conscientious house-to-house canvass one hundred voters appear to have registered without affidavit and voted on election day. The same may be said of many other districts when it is realized that five hundred and

eighty-eight names were added to the registry lists without affidavits on election day. I have earnestly examined the exhibits from which these figures are obtained.

There are certain occurrences exposed by the testimony which are impressive. The truth is often detected from the "odds and ends" of the evidence. The witness Ellis when at the polls in North Wildwood overheard "a very nice looking lady, about forty, big brown eyes, pretty face, heavy set," who was a member of the district board, ask a voter his name and address, but I shall let the witness Ellis tell it here in her own words: "She asked a man his name and his address, and when he gave it she asked him to spell the name. It was a very long name; I believe it was a Polish name, and he seemed to be puzzled and couldn't spell it, so she spelled it for him, and he said that he was using that name." The floater Gouck, an ex-convict whose very appearance would excite curiosity, had an even more interesting and welcome experience. A clerk of the election board in charge of the registry book asked him to spell his assumed name. He was unable to do so but the judge of the election board at the ballot box promptly spelled it for him. He remembers that the judge of the board wore a large sunflower on the lapel of his coat. Gouck voted four times on election day in four different districts.

Marion Ellis and also Mildred Ervin were apparently somewhat alarmed on an occasion when "the man that took the ballot when I came out after voting, I had folded it up and handed it to him, he opened it and said I had folded it the wrong way, and he looked at it, and I thought there was something wrong about that, because I had read in the papers that is a very secret matter. Q. Did you report it to anybody? A. Yes, to Chester Dick. Q. What did he say? A. He says, 'oh, that's all right.' "

Had it been necessary to deceive the members of the district boards, it is not likely that floaters would have been transported to the polls in groups of four in the same cars from time to time or that six or eight floaters would be simultaneously standing in line at the polls to receive their ballots. Mildred Ervin testified that she voted in the second ward,

second district, under the names "Virginia Holmes" and "Agnes Tomlin." Marion Ellis assumed the name of "Sylvia Perrett." Turning to the poll book it is observed that "Virginia Holmes" cast ballot 260, "Agnes Tomlin" ballot 261, "Sylvia Perrett" ballot 262. The floaters, Caldwell and Gressen, appear to have voted ballots 178 and 179 in the second ward, first district. In this same district the floaters, D'Amato and Ervin, under the names "Nora Duros" and "Gertrude Monahan" appear to have voted ballots 212 and 213. In the same district Blount voted ballot 443 and Willie Williams had ballot 444 in his hands when he was apprehended by the sheriff. When Marion Ellis returned again to this same polling place to vote under the name "Dora Wheaton," no member of the board said anything to her but she says, "all had smiles on their faces, as if they recognized me." She had not changed her attire. The floater McDonald, in undertaking to vote in the name of Ernest Roller in the third district of the first ward, was challenged. The board rejected the challenge and permitted him to vote without any affidavit. Similar action eventuated in other cases of like circumstances. A board member was shown the poll book merely indicating that one James Pinto had voted ballot 112 and ballot 343. The board member was asked "did Jimmie repeat?" The answer: "I don't know." Another member, when asked if Mildred Ervin had voted twice in his district, replied, "she might have done it. I couldn't say she didn't." A legal voter visited her polling place only to be informed that someone had already voted in her name.

Other events of consequence touching upon this phase of the contest may be readily extracted from the testimony. The conduct of the election boards is to be considered in the light of all of the accompanying and surrounding circumstances. Hundreds of persons were permitted to register and vote on election day in absolute disregard of the salutary requirements of the election law; an astonishing number of names were falsely entered upon the canvass books. The members of the district boards (not all were called as witnesses) failed to exonerate themselves. The conduct of the boards in the existing state of the evidence cannot reasonably

be attributed to innocence or ignorance. The members of the boards were fully aware of the provisions of the statute requiring affidavits from those seeking to register and vote on election day. The safeguard which the legislature imposed was flagrantly and shamefully ignored. If those who are said to have registered and voted on election day were not the qualified voters whose names appear, then, of course, the signatures on the affidavits would have definitely led to the exposure of the fraud. A strict compliance of the statute would have been the natural course of action pursued. In explanation, each member called, stated that some other member of the board personally knew the voter but the member possessing that knowledge was never discovered. Were a large number of the names which were added to the registry lists on election day without affidavits also utilized in the execution of the corrupt and fraudulent undertaking? A deliberate consideration of all of the evidence leads to that conclusion.

Manifestly, the evidence introduced at the hearing of this contest, in its most influential particulars, is not in a contradictory state. Gorman, the police recorder, who frequently sat at the hearing with counsel for the incumbent, was not called to contradict or explain the testimony relating to his activities. He is said to have caused the removal of Ward from the election board and is said to have been present at the hotel of Mae Wolf. Leo McGraw, who is said to have transported McDonald to Philadelphia to solicit floaters and to have conveyed Ervin and D'Amato to the polls and ultimately to have returned five of the floaters to Philadelphia in the evening, failed to contribute his testimony. Reds Maxwell gave no testimony. Mayor Bradway has not denied or explained the statements she is reported to have made at the polls. Her husband, who took lunch at the Mae Lloyd headquarters, did not occupy the witness chair. The proprietors of the Blackstone and Lyndhurst hotels were not interrogated. Counsel refrained from cross-examining the witness Mae Wolf. The factual problem in this contest rapidly begins to solve itself.

The testimony of acknowledged floaters should be earnestly scrutinized and cautiously weighed. In the detection of

fraud and crime, it is frequently necessary to go into dark places to gather light. So here, in the proof of fraudulent voting it became necessary to exhibit the mischievous practices to some extent by means of the testimony of willful and mercenary violators of the law. If it is assumed that these floaters were "seized by the horns and wrestled into submission," the fact remains that their testimony is highly probable, corroborated in many respects by the documentary exhibits and stands substantially uncontradicted.

Another question engages attention. Did these corrupt and fraudulent practices redound to the credit of Hunt in the election returns of these districts? Here again, the conclusion must be gleaned from the available and pertinent evidence. In whose interest were the floaters imported? In whose behalf were automobiles, dinners, lunches, drinks and clerical services supplied? In furtherance of what objective was the money expended by Chester Dick? With what view and for what purpose were all of the floaters exhorted to vote for Hunt? To what is the extraordinary majority of the incumbent in these districts attributable? Many reasons could be surmised, depending upon the fertility of the imagination. The evidence reveals only one reason. No other explanation was given. The conclusion that the incumbent was materially benefited by means of the colonization and personation of voters is inescapable.

In the closing days of the hearing, one John Paynter, who had been employed by the petitioners, voluntarily testified at the request of the incumbent that he had personally paid approximately forty-five persons $2 each to vote for the Democratic candidate for senator. If true this testimony only constitutes another contribution indicating that the election in Wildwood was saturated with fraud. His testimony, however, was not impressive. It transpired that he and his wife had been previously demanding more money from the petitioners for his services. A letter written by Mrs. Paynter at the behest of her husband evidences this fact. His request for more money was denied. He meets Recorder Gorman and a Mr. Bainbridge at a hotel in Philadelphia where arrangements are then made for the introduction of his testimony.

He could remember only one of the forty-five persons to whom the money was given. Paynter was in court assisting the petitioners during most of the hearing. His manner, demeanor and appearance do not inspire confidence in his words in the absence of some corroborative circumstances. Neither Gorman nor Bainbridge enlightened the court concerning the circumstances under which this witness so suddenly "changed his colors." His testimony is obviously intended to draw the Democratic candidate also into the shadow of fraud. It is to be realized that in this contest the public welfare rises above the private interests of the candidates.

It is apparent that the election in the Wildwood districts was not conformable to the intention of the legislature. It is evident that the law was prostituted to subserve the interests and gratify the wishes of a reckless faction determined to elect the incumbent to the office of state senator. It is certain that the elections in most of the districts were defiled and contaminated by fraudulent and illegal voting.

The proof may now be applied to the alleged grounds of the contest. It is alleged (1) that illegal votes were received for the incumbent sufficient to change the result. To sustain this ground the burden falls upon the contestants to prove the actual casting of sufficient illegal votes for the incumbent to enable the court with certitude to determine that the rejection of such votes changes the result of the election. This ground of contest is not adequately sustained by the evidence in this proceeding. *Lehlbach* v. *Haynes,* 54 *N. J. L.* 77; 23 *Atl. Rep.* 422; *Lippincott* v. *Felton,* 61 *N. J. L.* 291; *Brueckmann* v. *Frignoca,* 9 *N. J. Mis. R.* 128, 132; 152 *Atl. Rep.* 780.

The petitioners have also charged that the members of the district boards were guilty of misconduct, fraud or corruption sufficient to *challenge* the result of the election. It is the deliberate and conscientious conclusion of this court that this statutory ground of the contest has been adequately established by the credible evidence. The word "challenge" in the sense in which it is employed in the statute undoubtedly means "to call in question, to render doubtful." It seems reasonably probable from a thoughtful consideration of all of

the evidence that the incumbent received more than four hundred and thirty-seven illegal votes in the districts to which this contest has related. The exact number of such illegal votes cannot be definitely determined. Any reasonable and logical estimate founded upon the evidence would, of necessity, be somewhat speculative. Assuredly, the evidence of fraud and accompanying malconduct on the part of the members of the district boards, renders the election of the incumbent so gravely doubtful as to prohibit the issuance of a certificate of election to him.

It is desirable that the findings of fact and conclusions of law be explicitly stated.

The conclusions of this court are:

(1) That there was malconduct on the part of members of the district boards, particularly in the first ward, third district; second ward, first district, and second ward, second district, of Wildwood, sufficient to challenge the result of the election of a state senator in the county of Cape May;

(2) That in the existing state of the evidence it is reasonably and logically inferred that the incumbent received in the districts to which the petition relates more than four hundred and thirty-seven illegal votes;

(3) That when, in a contest, the result of an election is challenged, *i. e.,* in question and in doubt, by reason of malconduct on the part of members of district boards and the number of fraudulent and illegal votes cannot be definitely determined, the sole power conferred upon this court by the statute is to adjudge that such election be set aside.

The statute, however, imposes a limitation upon the power of the court to set aside an election for malconduct on the part of the members of the district boards. The limitation is reasonable and perfectly comprehensible. If the rejection of the vote of the districts in which malconduct existed would not change the result of the election, then the election shall not be set aside. Article XXVI, paragraph 362, section 8. This restriction of the power to set aside an election has no application to the factual situation existing in the present contest because the rejection of the vote of only the three districts last mentioned would change the result.

The senate is unrestricted in the exercise of its power to finally judicially determine the election of its own members, but this court can only exercise such powers as are bestowed upon it by the statute.

It has been earnestly argued in behalf of the petitioners that if the rejection of all the votes in the districts in which the members of the district boards were guilty of fraud and malconduct, would change the result of the election, the certificate of election should, under the statute, be awarded to Ludlam.

I am firmly of the opinion that the statute can not be so construed. If an election appears to have been so contaminated by fraud and malconduct of the nature specified in the statute as to render its result truly doubtful and the court is unable to calculate with reasonable certainty the number of legal votes respectively received by the candidates for the office, the appropriate and statutory remedy under article XXVI is to set aside the election. It is, therefore, the judgment of this court:

(1) That the incumbent, William C. Hunt, is not entitled to a certificate of election to the office of state senator for the county of Cape May;

(2) That the election on November 3d, 1936, in the county of Cape May to choose a state senator for said county, be set aside.